IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

NEW JERSEY CARPENTERS PENSION
FUND AND THE TRUSTEES THEREOF,

           Plaintiff,

     v.

HOUSING AUTHORITY AND URBAN
REDEVELOPMENT AGENCY OF THE
CITY OF ATLANTIC CITY, et al.,

           Defendants.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 12-2229 (JBS/AMD)

**OPINION**

APPEARANCES:

Seth Ptasiewicz, Esq.
KROLL, HEINEMAN CARTON LLC
Metro Corporate Campus I
99 Wood Avenue South, Suite 307
Iselin, N.J. 08830
    Attorney for Plaintiff

Susan E. Volkert, Esq.
George Gabriel Frino, Esq.
DECOTIIS, FITZPATRICK & COLE, LLP
500 Frank W. Burr Boulevard
Teaneck, N.J. 07666
    Attorneys for Defendants

**SIMANDLE, Chief Judge:**

## Contents

I.    INTRODUCTION ............................................... 2

II.   BACKGROUND ................................................. 5

  A.  Rule 56.1 Statements ..................................... 5

  B.  Factual Background ....................................... 7

   1.  Governance Structure of ACHA and ACIC ................. 8

   2.  1994 ACHA Agreement with Local 1578 ................... 9

   3.  Demand for Payment of Withdrawal Liability ........... 11

  C.  Procedural History ...................................... 12

  D.  Parties' Arguments ...................................... 13

   1.  The Pension Fund's Motion for Summary Judgment ....... 13

   2.  Defendants' Opposition and Cross-Motion .............. 14

III.  STANDARD OF REVIEW ........................................ 15

IV.   Discussion ................................................ 17

  A.  Multiemployer Pension Plan Amendments Act of 1980, 29
      U.S.C. § 1381 ........................................... 17

   1.  Defendants have Waived their Defense of "Illegality" or
       "Ultra Vires" ........................................ 19

   2.  ACHA and ACIC Constitute Statutory Employers under the
       MPPAA ................................................ 26

   3.  The 1994 Agreement Establishes an Obligation to
       Contribute ........................................... 42

V.    CONCLUSION ................................................ 46

## I.    **INTRODUCTION**

Plaintiff, the New Jersey Carpenters Pension Fund and the Trustees thereof (hereinafter, the "Pension Fund" or "Fund"), initiated this ERISA action in order to recover unpaid withdrawal liability purportedly due the Fund as a result of Defendants Atlantic City Housing Authority's (hereinafter,

2

"ACHA" or the "Housing Authority") and the Atlantic City Improvement Corporation, Inc.'s (hereinafter, "ACIC" and, together with ACHA, "Defendants") termination of Local Union 1578, Carpenters District Council of South Jersey, United Brotherhood of Carpenters and Joiners of America (hereinafter, "Local 1578")—a carpenters union comprised of Fund participants and beneficiaries. The Pension Fund specifically alleges in its Complaint that ACIC's termination of Local 1578's members effectuated a complete withdrawal from the Pension Fund, as defined under the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381-1405 (hereinafter, the "MPPAA"), to the Employee Retirement Income Security Program, 29 U.S.C. §§ 1001-1461 (hereinafter, "ERISA"), therefore triggering withdrawal liability in the amount of $517,460. The Pension Fund further alleges that the obligation for the unpaid liability runs to ACHA, particularly because Defendants operate under common control and otherwise demonstrate substantial overlap in governance.

Defendants assert, in response, that they do not constitute statutory employers for the purposes of withdrawal liability, and further argue that no agreement obligates Defendants to make pension benefit contributions. Rather, Defendants assert that a one-page agreement, executed in 1994, governs the prior

employment relationship between the parties, but nowhere references pension contributions, nor demonstrates the parties' intention that such relationship be governed by the withdrawal liability provisions of the MPPAA.  Defendants also claim that under New Jersey law they are incapable of entering into such a labor agreement and are immune from liability for doing so.

The parties now cross-move for summary judgment, alleging diametrically opposed positons: with the Pension Fund arguing that the "overwhelming and undisputed" evidence demonstrates that both the ACHA and ACIC constitute employers for purposes of assessing withdrawal liability under the federal mandate of the MPPAA, and that the record further reflects that Defendants agreed to remit—and, in fact, remitted contributions to the Pension Fund; and with Defendants asserting that the undisputed record demonstrates that Defendants possess no such contractual obligation, and that neither entity—under any set of circumstances—qualifies as an employer under ERISA.  [Docket Items 138 & 142.]

The parties do not, however, dispute that a written agreement, providing for the employment of Local 1578 carpenters and for the payment of fringe benefits, governed the parties' relationship.  Nor do the parties dispute that the ACHA remitted periodic sums to the Fund throughout ACIC's employment of Local

4

1578's carpenters.  Rather, the parties dispute the nature and effect of such agreement and, relatedly, challenge whether Defendants' conduct suffices to render them liable as "employers" under the MPPAA.

Consequently, the issues before the Court are whether ACHA and AICI constitute employers subject to withdrawal liability, as contemplated by the MPPAA, 29 U.S.C. § 1381, and whether, if so, an agreement existed by and between the parties sufficient to trigger Defendants' liability for a withdrawal penalty associated with AICI's termination of Local 1578's employment.[1] For the reasons that follow, the Court will grant in part the Fund's motion for summary judgment as stated below, and will deny Defendants' motion for summary judgment in its entirety, entering judgment for Plaintiff.[2]

II.  **BACKGROUND**

 **A. Rule 56.1 Statements**

Plaintiff accompanied its summary judgment motion with a statement of material facts not in disputed as required by L.

---

[1] The Court heard oral argument on the pending motions on December 3, 2014, at which time the Court permitted the parties to file brief supplemental submissions concerning the Court of Appeals for the Seventh Circuit's recent decision in Russ v. South Water Market, Inc., 769 F.3d 556 (7th Cir. 2014), reh'g denied (Nov. 5, 2014).  The parties' submissions followed. [Docket Items 55 & 56.]

[2] The Court exercises subject matter jurisdiction over the Fund's ERISA claims pursuant to 28 U.S.C. § 1331.

Civ. R. 56.1(a).  (Pl.'s SMF [Docket Item 38-2].)  Defendants
failed to furnish a response to the statement of undisputed
material facts in connection with the Fund's motion for summary
judgment.  Rather, Defendants filed a ten-paragraph statement of
undisputed materials facts—to which the Fund furnished a
response—in connection with Defendants' cross-motion for summary
judgment.  (Defs.' SMF [Docket Item 42-5].)  Defendants'
statement, however, substantially fails to respond to the Fund's
statement and to provide detailed citations to affidavits and/or
other documents in the record in order to substantiate the
statement's factual basis.  (Id.)

    In addition, much of Defendants' statement concerns the legal
relevancy of such facts, the inclusion of which the Court finds
inappropriate in connection with a Rule 56.1 statement. See L.
Civ. R. 56.1(a) ("Each statement of material facts shall be a
separate document (not part of a brief) and shall not contain
legal argument or conclusions of law.").  Defendants' submission
will therefore be disregarded to the extent it states legal
arguments or conclusions of law, and to the extent Defendants
failed to make clear any dispute with respect to the material
facts set forth in the Fund's statement.  Rather, the Court will
deem any such fact undisputed for purposes of the pending
motion. See L. Civ. R. 56.1(a) ("[A]ny material fact not disputed

6

shall be deemed undisputed for purposes of the summary judgment motion."). Consequently, though the Court will not ignore counter-stated facts that are readily apparent from Defendants' submissions, the Court need not comb the record in search of disputed facts that should have been part of Defendants' response to the Fund's Rule 56.1 statement.  That is the duty of a party opposing summary judgment.  Indeed, where, as in this case, a party fails to respond to the movant's statement of undisputed material facts with a point-by-point indication whether the stated fact is undisputed or, if disputed, with a citation to the factual record where contrary evidence exists, and where no contrary fact is readily apparent in the opponent's evidence, then the Court assumes that the opponent has no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion.

**B. Factual Background**

The Pension Fund constitutes a multi-employer benefit plan governed by ERISA, 29 U.S.C. §§ 1002(3), 1301(a)(3), and the Trustees thereof act as fiduciaries on behalf of the Fund and its participants and beneficiaries.  (Pl.'s SMF at ¶¶ 1-2.) ACHA, a "body corporate and politic" statutorily created by the City of Atlantic City" and funded by the United States Department of Housing and Urban Development, owns and operates

7

low incoming housing facilities in the City of Atlantic City. (Defs.' SMF at ¶ 1; Pl.'s SMF at ¶¶ 3, 8; Pl.'s Resp. SMF at ¶ 1.)  ACHA maintains its office and principal place of business at 227 North Vermont Avenue, Atlantic City, New Jersey 08404. (Pl.'s SMF at ¶ 2; Defs.' Answer & Countercl. at ¶ 2.)  ACIC, a non-profit corporation formed for the purposes of employing union members and apprentices on ACHA's behalf, maintains its office and principal place of business in the same facility. (Pl.'s SMF at ¶ 3; Def.'s SMF at ¶¶ 2, 7; Defs.' Answer & Countercl. at ¶ 1.)

### 1. Governance Structure of ACHA and ACIC

During the relevant period, ACIC operated at the behest of and out of the same office as ACHA, in order to assist in the fulfillment of ACHA's public purpose and, principally, in order to form an apprentice training program.  (Pl.'s SMF at ¶ 46.) Indeed, ACIC's Amended and Restated Bylaws filed January 27, 2005 conferred on ACHA broad authority over ACIC's day-to-day operations, including: the right to appoint ACIC's entire five (5) member Board of Trustees; the right to remove any ACIC Trustee "without assignment" of cause; and the authority to veto "[a]ny action" taken by ACIC's Board, "which in the opinion of [] ACHA violates the principles and purposes of [ACHA] or detrimentally impacts" its operations.  (Ptasiewicz Cert., Ex. H

at 1, 3.)  In addition, the governing bodies of both entities overlapped to a substantial degree during the relevant period, with various individuals serving on the Boards of both entities, and with the Executive Director of ACHA "[t]raditionally" also serving as the Secretary of ACIC.  (Id. at Ex. G at 18:25-20:14, 56:12-16.)

### 2. 1994 ACHA Agreement with Local 1578

On August 26, 1994, then-Executive Director of the ACHA, John J. McAvaddy, entered into a one-page agreement with Local 1578 (hereinafter, the "agreement"), which provided:

1. The Housing Authority intends to hire workers directly from Local Union 1578 to complete work associated with the repair and renovation of units owned and/or managed by the Housing Authority. The scope of work shall cover all phases of the carpentry craft previously awarded to Local Union 1578, including lead paint abatement and asbestos abatement.

2. The Housing Authority agrees to pay the current Wage Rates and all the fringe benefits set forth in the Agreement, including any increases that are currently being negotiated which may be agreed upon during the term of this Agreement.

3. The Union agrees that the members hired by the Housing Authority will sign a stipulation that they do not wish to participate in the health and welfare plan currently providing coverage to Housing Authority employees, to wit: the New Jersey State Health Benefits Plan.

(Pl.'s SMF at ¶ 9; Ptasiewicz Cert., Ex. L [Docket Item 38-4]; Defs.' SMF at ¶ 3.)  In accordance with the agreement, from

"about 1996 to February 25, 2011," ACIC operated "a carpentry apprentice" program in which ACIC hired Local 1578 members "to perform carpentry tasks."  (Ptasiewicz Cert., Ex. G at 48:14-22; Pl.'s SMF at ¶¶ 10-11 (citing Defs.' Answer & Counterclaim at ¶¶ 9-10).)

Though ACIC issued the paychecks, ACHA directly supervised the union carpenters, prescribed the terms and conditions of the "Local 1578 members 'employed' by the" ACIC, and directed the employees to complete projects on behalf of both entities. (Pl.'s SMF at ¶¶ 14; Defs.' SMF at ¶ 8; Ptasiewicz Cert., Ex. W at 10:8-14.)  Indeed, Ira Fornorow, ACHA's Acting Director of Redevelopment and the ACHA employee formerly responsible for the "maintenance of the ACIC," oversaw and assigned the union employees, maintained their pay sheets, time, and other payroll information, and "deal[t]" with "any issues" that arose in the course of such activity.  (Ptasiewicz Cert., Ex. W at 8:3-12, 15:10-17.)  Local 1578 further provided members' salary information directly to ACHA for payroll purposes.  (Defs.' SMF at ¶ 9; Ptasiewicz Cert., Ex. G at 87:15-88:14 (noting that "the carpenters union" transmitted wage and benefit rate statements directly to the ACHA accounting department).)  ACHA, accordingly, provided the funds necessary for the Local 1578 employees' biweekly pay checks, and reimbursed ACIC for all

other expenses and costs incurred in connection with their employment (Defs.' SMF at ¶ 8), including, "checks, forms, envelopes, postage, telephone, liability and workers' compensation insurance," and certain taxes. (Ptasiewicz Cert., Ex. R.)  ACHA also remitted "payment[s] reflecting" fringe benefit contributions due to the Pension Fund on behalf of the Local 1578 employees, and resolved, on occasion, "discrepancies" that arose concerning the amount of the contribution owed to the Fund.  (Pl.'s SMF at ¶ 16; Ptasiewicz Cert., Exs. M (setting forth payments from ACHA to the Pension Fund), U (enclosing by letter from ACHA to the Fund a check in the amount of $26,117.50).)

On February 15, 2011, however, ACIC issued termination notices to all Local 1578 carpentry employees, purportedly on the basis of "'budgetary constraints.'"  (Pl.'s SMF at ¶¶ 19-20; Defs.' SMF at ¶ 10.)  ACHA thereafter issued an "Invitation for Bids for 'On-Call Carpentry Repairs/Services[,]'" and ultimately accepted the bid from Althea Property Services, LLC, an entity that "neither employs Local 1578 employees" nor contributes to the Fund.  (Pl.'s SMF at ¶¶ 21-22.)

### 3. Demand for Payment of Withdrawal Liability

As a result of Defendants' "'complete[] withdrawal'" from the Fund, on July 27, 2011, the Fund prepared a payment

schedule, and demanded payment of withdrawal liability in the
amount of $517,460, payable in seventeen (17) quarterly payments
of $33,278.75.  (Ptasiewicz Cert., Ex. A.)  ACHA, by various
written correspondence, disputed its obligation to remit any
such payment on the basis that the Local 1578 members acted as
employees of ACIC, not ACHA.  (See id. at Exs. B, D.)  By letter
dated March 22, 2012, however, ACHA indicated that it intended
to initiate arbitration pursuant to 29 U.S.C. § 1401(1)(1)(A),
notwithstanding its continuing challenge to its identification
as an employer under the applicable provisions of ERISA.
(Ptasiewicz Cert., Ex. F.)  During the pendency of this
litigation, however, the parties entered into a written
agreement to stay the arbitration until conclusion of this
action.  (Pl.'s SMF at ¶ 25; Defs.' SMF at ¶ 26.)

**C. Procedural History**

Because Defendants purportedly "failed and refused" to pay
the incurred withdrawal liability, the Fund filed the two-count
Complaint in this action on April 13, 2012, seeking the entry of
judgment against Defendants in the amount of the withdrawal
liability, plus liquidated damages, interest, and attorneys'
fees and costs.  (See Compl. at ¶¶ 31-48.)  On June 29, 2012,
Defendants answered the Fund's Complaint, accompanied by their
own assertion of counterclaims.  In the counterclaims,

12

Defendants assert that Defendants never executed any agreement
with Local 1578 (whether in the form of a collective bargaining
agreement or otherwise), nor possessed any other obligation to
make contributions to the Fund. (Answer & Countercl. [Docket
Items 8 & 9], 6-11.)  Defendants accordingly seek declarations
finding Defendants not liable for any withdrawal penalty, in
addition to an award of attorneys' fees and costs.  (Id.)  The
parties progressed through the pretrial discovery, and the
pending motions followed.

**D. Parties' Arguments**

**1. The Pension Fund's Motion for Summary Judgment**

The Fund argues in its motion for summary judgment that an
obligation to contribute to a pension fund under ERISA need not
be solely memorialized in a formal collective bargaining
agreement.  (Defs.' Br. at 11.)  Rather, the Fund contends that
such obligation need only be evidenced by "some type of
writing[.]"  (Id.)  The Fund accordingly argues that the 1994
agreement clearly constitutes Defendants' "binding promise" to
remit contributions to the Pension Fund "for work performed by
Union Carpenters on their behalf." (Id. at 18.)  In support of
this assertion, the Fund points to Defendants' continued
contributions to the Fund, coupled with the testimony of
Defendants' various former and current employees concerning the

13

purportedly indisputable nature of the parties' agreement.  (Id. at 17-18.)

Relying upon the liberal construction afforded remedial statutes, like ERISA, the Fund relatedly asserts that the ACHA constitutes an employer for the purposes of withdrawal liability "based on either a common control or alter ego liability theory." (Id. at 18-19.)  In so asserting, the Fund acknowledges that ACIC technically employed the Local 1578 carpenters in accordance with the Agreement, but asserts that the undisputed facts demonstrate that "ACHA controlled the purse strings and the day to day job performance and duties of the ACIC Union Carpenters," (id. at 19, 37), and thus was an employer under federal law.

### 2. Defendants' Opposition and Cross-Motion[3]

Defendants counter in opposition, and by way of cross-motion for summary judgment, that no permissible construction of the MPPAA permits a governmental entity, like ACHA, to be deemed an employer for the purposes of withdrawal liability, particularly because such entities do not exist for the purposes of conducting business, nor operate for profit.  (Defs.' Cross-

---

[3] Defendants separately filed their cross-motion for summary judgment and opposition to the Fund's motion.  (See Defs.' Br. [Docket Item 42-3]; Defs.' Opp'n [Docket Item 46].)  The arguments, however, are substantively identical, and the Court has accordingly considered the arguments in unison.

Mot. at 15-16, 18.)  Indeed, counsel for Defendants asserted on
the record on December 3, 2014 that the ACHA could never have
become an employer of the Local 1578 members, for doing so would
have directly contravened New Jersey State Civil Service Laws.
In that regard, Defendants argue that the 1994 Agreement arose
from the "totally illegal" and <u>ultra vires</u> acts of both
entities, thereby rendering such Agreement unenforceable.
(Defs.' Supp. Br. [Docket Item 56].)

Defendants further assert that the undisputed record in
this action fails to reflect the existence of a collective
bargaining agreement conferring on Defendants a contractual
obligation to make pension contributions to the Fund.  (Defs.'
Cross-Mot. at 23-24.)  In so contending, Defendants concede that
Defendants' personnel "responded to requests for monies from the
Fund and issued [contribution] payments," but construe such
payments as aberrant acts, committed through "sloppy
bookkeeping" and without understanding that such remittances
might create "federal statutory liability under the MPPAA."
(Defs.' Opp'n and Reply at 21.)

III. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) generally provides
that the "court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact" such

15

that the movant is "entitled to judgment as a matter of law."
FED. R. CIV. P. 56(a). A "genuine" dispute of "material" fact
exists where a reasonable jury's review of the evidence could
result in "a verdict for the non-moving party" or where such
fact might otherwise affect the disposition of the litigation.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
Disputes over irrelevant or unnecessary facts, however, fail to
preclude the entry of summary judgment. Id.  In evaluating a
motion for summary judgment, the Court must view the evidence in
the light most favorable to the non-moving party, and must
provide that party the benefit of all reasonable inferences.
Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer,
750 F.3d 273, 287 (3d Cir. 2014).  However, any such inferences
"must flow directly from admissible evidence[,]" because "'an
inference based upon [] speculation or conjecture does not
create a material factual dispute sufficient to defeat summary
judgment.'"  Halsey, 750 F.3d at 287 (quoting Robertson v.
Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir. 1990);
citing Anderson, 477 U.S. at 255).

　　Moreover, "[t]he standard by which the court decides a
summary judgment motion does not change when the parties file
cross-motions." United States v. Kramer, 644 F. Supp. 2d 479,
488 (D.N.J. 2008). Consequently, the Court's evaluation of the

pending motions remains unaltered: "the court must consider the motions independently and view the evidence on each motion in the light most favorable to the party opposing the motion." Id. (citation omitted).

IV. **Discussion**

    A. **Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381**

Congress enacted the "comprehensive and complex" provisions of ERISA, Estate of Kensinger v. URL Pharma, Inc., 674 F.3d 131, 135 (3d Cir. 2012), in order to protect employees' pensions rights, and to provide a uniform regulatory scheme concerning legal issues arising out of employee benefit plans. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983); Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., 513 U.S. 414, 416 (1995) (discussing purpose of ERISA and MPPAA amendments). In the MPPAA, however, Congress amended ERISA out of a concern that ERISA did not adequately protect multiemployer pension plans from "'the adverse consequences that result'" from an individual employer's decision to terminate or withdraw their participation in a benefit plan. Einhorn v. M.L. Ruberton Constr. Co., 632 F.3d 89, 96 (3d Cir. 2011) (quoting SUPERVALU, Inc. v. Bd. of Trustees of Sw. Pa. & W. Md. Area Teamsters & Emp'rs Pension Fund, 500 F.3d 334, 336 (3d Cir. 2007) (citations omitted)).  The amendments therefore endeavored to prevent

17

employers subject to obligations to contribute "from withdrawing from a multiemployer pension plan without paying their share of unfunded, vested benefit liability, thereby threatening the solvency of such plans." Id. (citation omitted).

To that end, the MPPAA created the concept of withdrawal liability, which renders an employer liable for a withdrawal penalty in the event of a qualifying withdrawal from a multiemployer pension plan. See 29 U.S.C. §§ 1381(a), 1391. The MPPAA specifically holds an employer that effects a "complete" or "partial" withdrawal liable to the pension plan for its share of the plan's unfunded vested benefits allocable to the withdrawn employer.[4] Id. The imposition of such liability aims, in essence, to lessen the harm borne by the pension fund as a result "of the loss of the withdrawn employer's future contributions." O'Connor v. DeBolt Transfer, Inc., 737 F. Supp. 1430, 1435 (W.D. Pa. 1990) (internal citations omitted).[5]

---

[4] Under the MPPAA, "complete withdrawal" occurs when an employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).  In the present case, ACHA effected a complete withdrawal for MPPAA purposes.

[5] Under the MPPAA, "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 ... shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1).  Generally, arbitration constitutes the precondition to filing suit in

Consequently, as agreed by the parties on the record on December 3, 2014, the Court must engage in a two-step inquiry. First, the Court must determine whether ACHA and ACIC constitute statutory employers under the MPPAA.  Second, the Court must consider whether ACHA and ACIC "'had an obligation to contribute'" to the pension fund.  Transpersonnel, Inc. v. Roadway Exp., Inc., 422 F.3d 456, 460 (7th Cir. 2005) (quoting Cent. States, Se. and Sw. Areas Pension Fund v. Central Transport, Inc., 85 F.3d 1282, 1287 (7th Cir. 1996)).  The Court will address each in turn.

### 1. Defendants have Waived their Defense of "Illegality" or "Ultra Vires"

At the outset, however, the Court dispenses with Defendants' recent threshold position that ACHA "cannot be a

---

district court.  See Einhorn v. Dubin Bros. Lumber Co., Inc., _____ F. Supp. 2d _____, No. 12-6814, 2014 WL 3519064, at *4-*5 (D.N.J. July 16, 2014) (discussing the MPPAA's generally mandatory arbitration provisions).  The parties discussed concordantly, and at great length, the Court's jurisdiction to resolve the issue concerning whether Defendants constitute statutory employers under the MPPAA—both, of course, agreeing that the Court possesses such jurisdiction.  The Court therefore only briefly notes that, the question of whether an entity qualifies as an employer under the MPPAA clearly constitutes a legal question for a district court, not an arbitrator, particularly because the MPPAA only compels arbitration between a statutory employer and the plan sponsor.  See, e.g., Bd. of Trustees of Trucking Employees of N. Jersey Welfare Fund, Inc. – Pension Fund v. Centra, 983 F.2d 495, 501 (3d Cir. 1992); Bowers v. Transportacion Maritima Mexicana, S.A., 901 F.2d 258, 261 (2d Cir. 1990)

statutory employer" for the purposes of MPPAA liability, because
the ACHA lacks "singlehanded[]" authority to perform "'an act
utterly beyond the jurisdiction'" authorized to it.  (Defs.'
Supp. Br. at 2-3.)  In that regard, Defendants argue that New
Jersey's Civil Service Laws prohibit the ACHA from "being the
'employer' of employees" for a period longer than one year.
(Id.)  Defendants therefore assert that the 1994 agreement could
not relinquish "the ACHA's rights to abide by the law[,]"
therefore rendering the Agreement <u>ultra</u> <u>vires</u> or, as argued
here, an "illegality."  (Id. at 2-3, 5-6.)

    The Court first notes that Defendants did not plead such
defense in their Answers or Counterclaims.[6]  [Docket Items 11 &
12.]  Indeed, the Fund asserts that Defendants never raised such
defense in any of the "pleadings, correspondence submitted to
the Fund by [the Fund's] counsel upon receipt by Defendants of
the withdrawal liability assessment, in Defendants' initial
disclosures or in any discovery provided to [the Fund] during
this litigation."  [Docket Item 57.]

    Rather, Defendants raised this defense, for the first time,
in connection with their reply brief in further support of
Defendants' pending motion for summary judgment (and again on

---

[6] Prior counsel for Defendants, Gregory V. Bevelock, Esq., signed
and filed Defendants' Answers and Counterclaims. [Docket Items 8
& 9.]

20

the oral argument record on December 3, 2014).[7]  (See Defs.'
Reply at 12-14, 21.)  The predicate for this defense, however,
rests upon facts long in the possession of Defendants, and
should therefore have been presented earlier in order to be
considered in connection with the pending motions.  Indeed,
under Federal Rule of Civil Procedure 8(c), ultra vires, or, as
argued here, illegality,[8] constitutes an affirmative defense
which Defendants waived by failing to affirmatively state such
defense in their Answers.[9]  See FED. R. CIV. P. 8(c)(1); Pujals ex

---

[7] Counsel for Defendants also argued on the record on December 3,
2014, that sovereign immunity bars the Fund's claims.  As with
the illegality assertion, Defendants did not raise any sovereign
immunity defense in their Answers or Counterclaims, nor have
Defendants relied upon such defense in their supplemental
submission.  Consequently, the Court need not address the
application of sovereign immunity in this instance.  The Court
notes, however, that Defendants' assertion of counterclaims
arguably effectuated a waiver any applicable immunity.
[8] Though ultra vires and illegality may, in certain
circumstances, refer to distinct defenses, see, e.g., Barfield
v. Sho-Me Power Elec. Co-op., 10 F. Supp. 3d 997, 1020 (W.D. Mo.
2014), Defendants in this instance challenge both ACHA's
authority to enter into the 1994 Agreement and the legality of
the Agreement itself.  Consequently, for purposes of the pending
motions, such terms have a synonymous meaning and, indeed,
Defendants' submissions rely upon the terms interchangeably.
(See, e.g., Defs.' Supp. Br. at 1-4.)  The Court, accordingly,
construes the defenses for purposes of the pending motion as
coextensive.  See Frontier Commcn's Corp. v. Barrett Paving
Materials, Inc., No. 07-113, 2009 WL 3062322, at *6 n.6 (D. Me.
Sept. 23, 2009) (considering illegality and ultra vires
interchangeably).
[9] For that reason, the Court rejects counsel for Defendants'
assertion that the boilerplate assertion of "failure to state a

<u>rel. El Rel De Los Habanos, Inc. v. Garcia</u>, 777 F. Supp. 2d 1322, 1330-31 (S.D. Fla. 2011) (construing <u>ultra</u> <u>vires</u> as an affirmative defense); <u>U.S. Chess Federation, Inc. v. Polgar</u>, No. 08-5126, 2009 WL 981257, at *5 (N.D. Cal. 2009) (same).

However, in considering whether Defendants' failure to raise the affirmative defense effectuated a waiver, the Court must consider whether Defendants' untimely assertion caused "'surprise or undue prejudice'" by failing to provide the Fund with "'notice and the opportunity to demonstrate why the affirmative defense should not succeed.'" <u>In re Sterten</u>, 546 F.3d 278, 285 (3d Cir. 2008) (quoting <u>Robinson v. Johnson</u>, 313 F.3d 128, 134-35 (3d Cir. 2002)) (citation omitted).  Counsel for the Fund makes palpable claims for both prejudice and surprise, in light of the fact that the Fund had no prior notice of this defense, nor the opportunity to conduct the discovery and legal research invariably required to prove and/or disprove such theory. [Docket Item 57.]  The Court agrees.  For two years these parties have litigated the claims and defenses that were raised, and never was illegality plead or even mentioned as a defense until after the principal briefs on these cross-motions for summary judgment were filed.  Defendants point to no reason

---

claim" necessarily includes the assertion of <u>ultra</u> <u>vires</u>, or illegality.

why the illegality defense could not have been raised in their
Answers and Counterclaims long ago.  The Court therefore finds
such defense waived.  See, e.g., Anderson v. Thermo Fisher
Scientific, No. 11-3394, 2013 WL 1222738, at *1 n.1 (D.N.J. Mar.
25, 2013) (refusing to consider an affirmative defense raised,
for the first time, in connection with the parties' summary
judgment briefing); Ingram v. U.S., 808 F.2d 1075, 1079 (5th
Cir. 1987) ("Central to requiring the pleading of affirmative
defenses is the prevention of unfair surprise. A defendant
should not be permitted to 'lie behind a log' and ambush a
plaintiff with an unexpected defense.").

       However, even if the Court, contrary to the above, found no
waiver, the Court would still find that Defendants have failed
to meet their burden of demonstrating the defense's application
in this instance.  See Emp'rs Ins. of Wausau v. Titan Int'l.,
Inc., 400 F.3d 486, 490 (7th Cir. 2005) (noting that illegality
is an affirmative defense, and that "of course defendants have
the burden of proving affirmative defenses").  Notably,
Defendants' argument rests upon a faulty premise, namely, the
notion that because the ACHA should not have employed the Local
1578 members, other than in accordance with the Civil Service
Laws, that the ACHA necessarily did not do so.  (Defs.' Supp.
Br. [Docket Item 56].)  In so arguing, however, Defendants

23

provide no legal authority for their position that New Jersey's
Civil Service Laws constrained ACHA's employment decisions.
Rather, Defendants vaguely rely upon an opinion letter authored
by a retired Justice of the New Jersey Supreme Court.  (See,
e.g., Defs.' Reply at 22.)  The opinion letter, however, does
not constitute relevant authority of a binding or persuasive
nature in connection with the pending motions.

Moreover, even if the ACHA contravened New Jersey's Civil
Service Laws in executing the 1994 Agreement, such violation
would not appear to render the Agreement a nullity.  Rather,
violations of New Jersey Civil Service Law would potentially
subject ACHA to certain, primarily monetary, penalties.  See
N.J.A.C. §§ 4A:10-1.1, -2.1 (listing, in the disjunctive, the
various penalties that "may" be imposed in the event an entity
violates the Civil Service Laws).

For all of these reasons, the Court finds that Defendants
have not demonstrated, as required under New Jersey's ultra
vires doctrine, that the ACHA "'was utterly without capacity'"
to enter into the 1994 Agreement.  Porte Liberte II Condominium
Ass'n, Inc. v. New Liberty Residential Urban Renewal Co.,
L.L.C., 86 A.3d 730, 739 (N.J. Super. Ct. App. Div. 2014)
(citation omitted).  Indeed, such actions would traditionally
"enjoy a presumption of validity," Bryant v. City of Atl. City,

707 A.2d 1072, 1079 (N.J. Super. Ct. App. Div. 1998), and
Defendants have not come forward with evidence to demonstrate
any patent invalidity in this instance.[10]  The Court therefore
concludes that New Jersey's Civil Service Laws do not alone
provide any insulation from withdrawal liability, where the
definition of a statutory employer under the MPPAA depends upon
federal law and not upon state civil service regulations,
particularly given the broad-sweeping and remedial nature of the
MPPAA.  See IUE AFL–CIO Pension Fund v. Barker & Williamson,
Inc., 788 F.2d 118, 127 (3d Cir. 1986) (noting that "because
ERISA (and the MPPAA) are remedial statutes, they should be
liberally construed in favor of protecting the participants in
employee benefit plans") (citations omitted).  Stated
differently, the notion that state law precludes these ACIC
employees from being counted as ACHA employees does not alter
the question presented here of whether, under federal law, ACHA
was a statutory employer for MPPAA purposes.  The Court,
accordingly, turns to whether Defendants constitute entities
subject to withdrawal liability under the MPPAA.

---

[10] Nor, as explained below, does the MPPAA exempt municipal
agencies from the consequences of obligations such agencies
voluntarily undertake.

### 2. ACHA and ACIC Constitute Statutory Employers under the MPPAA

In order to properly frame the issues implicated by the pending motions—namely, the parties' dispute concerning the application of concepts unique to the MPPAA, like "employer[,]" "common control[,]" and "alter ego"—the Court will briefly introduce the applicable framework.

### a. "Employer" and "alter ego" Liability under the MPPAA

Responsibility for payment of withdrawal liability attaches in the first instance to the withdrawing employer.  The MPPAA, however, "nowhere defines what constitutes an 'employer' responsible for withdrawal liability."  Brown v. Astro Holdings, Inc., 385 F. Supp. 2d 519, 527 (E.D. Pa. 2005) (citing Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transport Inc., 85 F.3d 1282, 1287 (7th Cir. 1996)).  Indeed, though the definitional provisions of the MPPAA defines a "substantial employer" for purposes of a single-employer plan, such provisions set forth no definition of an employer, substantial or otherwise, for purposes of a multiemployer plan, as here. 29 U.S.C. § 1301(a)(2).  Nor can the Court turn to the definition of "employer" as set forth in the general definitional provisions of ERISA.  29 U.S.C. § 1002(5).  Indeed, such provisions have expressly limited application to Title I of

26

ERISA and do not otherwise apply to the MPPAA, set forth in Title IV of ERISA.  See Mary Helen Coal Corp. v. Hudson, 235 F.3d 207, 212 (4th Cir. 2000) (finding the definition of "employer" in Title I inapplicable to the definition of "employer" in Title IV); Nachman Corp. v. Pension Guar. Benefit Bd., 446 U.S. 359, 370-71 (1980) (cautioning that the definitions in Title I are "not necessarily applicable to Title IV").  Rather, the "final analysis" concerning who constitutes an employer subject to withdrawal liability under the MPPAA "must be left to the courts."  Korea Shipping Corp. v. N.Y. Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Trust Fund, 880 F.2d 1531, 1536 (2d Cir. 1989) (citation omitted).

"The United States Court of Appeals for the Third Circuit has not yet addressed how, in the absence of a statutory definition, a court should define an 'employer' under the MPPAA."  Brown, 385 F. Supp. 2d at 527; see also Gov't Dev. Bank for P.R. v. Holt Marine Terminal, Inc., No. 02-7825, 2011 WL 1135944, at *12 (E.D. Pa. Mar. 24, 2011) (noting that, "the MPPAA contains no definition of an 'employer,' and this definition has instead been 'left to the courts.'") (citation omitted).  The seven appellate courts that have addressed such definition, however, have all adopted the definition established by the Court of Appeals for the Second Circuit in Korea Shipping

27

Corporation v. New York Shipping Association-International
Longshoremen's Association Pension Trust Fund, 880 F.2d 1531,
1536 (2d Cir. 1989).  Brown, 385 F. Supp. 2d at 528 (collecting
cases concerning the appellate courts that have followed Korea
Shipping).

In Korea Shipping, the Second Circuit considered, in
consolidated appeals, whether two steamship carriers—neither of
which directly employed their own labor force—nevertheless
qualified as employers under the MPPAA of the longshoremen who
loaded and/or discharged their cargo at port.  880 F.2d at 1534.
Two collective bargaining agreements governed operations at the
port: one being "the so-called 'master agreement,'" which set
forth "uniform terms applicable to ports in which the"
International Longshoremen's Association functioned and
specifically included pension contributions and "the payment of
'job security program assessments'" in order to offset
shortfalls in contributions to longshoremen pension funds; and
the other being the general cargo agreement, which governed the
terms and conditions specific to the Port of New York, including
"pension benefits, seniority, hiring, safety, and holidays."
Id.  The steamship carriers executed both agreements and, prior
to the cessation of their operations, "regularly complied with
their [pension] assessment obligations" under the various

agreements.  <u>Id.</u>  The carriers, however, resisted the pension
fund's efforts to assess withdrawal liability, arguing that the
stevedoring companies, the direct employers of the longshoremen,
bore sole responsibility for any withdrawal liability.  <u>Id.</u> at
1535.

In rejecting such argument, the district court found no
reasoned basis to absolve a pension contributing indirect
employer from withdrawal liability, solely because of the
absence of any direct employment relationship.  <u>Id.</u>  On appeal,
the Court of Appeals for the Second Circuit, after surveying
"remedial and protective purposes" articulated by Congress in
the MPPAA's enactment, agreed and concluded that "employer"
under the MPPAA included any person or entity "obligated to
contribute to a [pension] plan either as a direct employer or in
the interest of an employer of the plan's participants."  <u>Id.</u> at
1537.

As stated above, most courts that subsequently considered
the issue "have followed the lead" of <u>Korean Shipping</u> in
evaluating the applicable contours of an "employer" under the
MPPAA.  <u>Gov't Dev. Bank for P.R.</u>, 2011 WL 1135944, at *12 n.21
(citation omitted).  Certain courts, however, have relatedly
extended the definition of "employer" under the MPPAA to include
such entities' "alter egos."  <u>See, e.g.</u>, <u>id.</u> at *12 (summarizing

29

the court's prior ruling in Brown concerning an alter ego theory
of liability under the MPPAA).  In so extending, at least one
court persuasively concluded that an alter ego theory of
liability "would not" result in the undue expansion of
withdrawal liability, because such claims rested upon
allegations that the alter ego acted as "'essentially the same
entity' as the employer" liable for withdrawal liability under
29 U.S.C. § 1381(a).  Id.  The Court agrees, and finds
attachment of withdrawal liability to an alter ego consistent
with the fundamental policy and purpose of the MPPAA, namely, to
prevent employers from strategically shifting assets in order to
avoid an employer's MPPAA liability.  See id.; see also Brown,
285 F. Supp. 2d at 531-32 (finding that, "that the MPPAA permits
a plaintiff to bring a claim for alter ego liability alleging
that a defendant is the alter ego of the statutory employer");
Bd. Of Trustees, Sheet Metal Workers' Nat. Pension Fund v.
Palladium Equity Partners, LLC, 722 F. Supp. 2d 854, 871 (E.D.
Mich. 2010) ("'The alter ego doctrine was developed to prevent
employers from evading obligations under the [MPPAA] merely by
changing or altering their corporate form.'") (citation
omitted).

30

### b. "Common Control" Liability under the MPPAA

The MPPAA, however, also extends liability beyond the withdrawing employer to "trades or businesses (whether or not incorporated) which are under common control" with the withdrawing employer. 29 U.S.C. § 1301(b)(1). The MPPAA renders such entities jointly and severally liable for any withdrawal liability. The statute, however, does not define "under common control" or "trade or business" and instead directs that such phrases be defined in a manner "consistent and coextensive with" regulations promulgated by the Treasury Department under section 414(c) of the Internal Revenue Code (hereinafter, the "IRC"), 26 U.S.C. § 414(c). Id.

Defendants, in essence, concede that ACHA and ACIC are under common control, given the undisputed overlapping governing structures. Rather, Defendants dispute whether ACHA and/or ACIC, as public entities, qualify as a "trade or business" under 29 U.S.C. § 1301(b)(1). The IRC, however, does not provide a general definition for "trade or business." In interpreting "trade or business" for purposes of the IRC, the Supreme Court concluded that engagement in a "trade or business" requires regular and continual involvement in an activity, primarily for the purpose of income or profit. Comm'r of Internal Revenue v. Groetzinger, 480 U.S. 23, 35 (1987). Courts have not, however,

31

been inflexible in their application of the Groetzinger test. Rather, courts have primarily "undertaken a factual inquiry to determine whether characterizing an entity as a 'trade or business' will fulfill the underlying purpose of the MPPAA: to prevent employers from avoiding withdrawal liability by fractionalizing their operations." Gov't Dev. Bank for P.R., 765 F. Supp. 2d at 715 (citation omitted); see also Brown, 385 F. Supp. 2d at 533 ("The legislative history of the common control provisions indicates that Congress enacted them 'in order to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities.'") (citations omitted).

### c. Application to Defendants

In considering the application of the various theories of "employer" liability to the pending litigation, the Court rejects Defendants' assertion that Defendants' "public entity" status exculpates them, entirely, from the confines of the MPPAA. (See Defs.' Opp'n and Reply at 8, 22-25.) Specifically, though Defendants concede that neither entity "'established or maintained'" a pension fund, as required by the governmental plan exemption, 29 U.S.C. § 1002(32), Defendants vaguely assert that the Court could conclude that, "unbeknownst" to ACHA, it

32

"established a governmental plan" in forwarding contributions to the Fund.  (Id. at 24.)

However, it is readily apparent that, "when a state or local government body 'voluntarily accept[s] a private welfare benefit plan for its employees it cannot later complain that ERISA regulation of that plan invades its sovereignty.'"  City of Warwick v. Laborers Int'l Union of N. Am., No. 08-366, 2009 WL 462690, at *4 (D.R.I. Feb. 23, 2009) (quoting Livolsi v. City of New Castle, Pa., 501 F. Supp. 1146, 1150 (W.D. Pa. 1980)).  Moreover, though the MPPAA codifies an exemption applicable to a plan comprised solely of governmental employees, see 29 U.S.C. §§ 1003(b)(1), 1002(32), such exemption has no application to a pension fund in which non-governmental employees likewise participate.  Livolsi, 501 F. Supp. at 1148 (finding a multiemployer welfare fund not exempt from the MPPAA, because the fund included private and public employers).  Here, it is undisputed that both private and public employers participate in the Fund.  Indeed, the litany of cases in this District involving the Fund provide unequivocal support for this conclusion.  See, e.g., N.J. Reg'l Council of Carpenters v. Chanree Constr. Co., Inc., No. 13-5613, 2014 WL 980649 (D.N.J. Mar. 12, 2014) (noting the Fund's inclusion of private employees); N.J. Reg'l Council of Carpenters v. N.J.

33

Installations, L.L.C., No. 11-5588, 2013 WL 2096565 (D.N.J. May
14, 2013) (same).  Consequently, Defendants' status as a public
entity does not, without more, squarely resolve the application
of the MPPAA in this instance.  The Court therefore turns to
whether genuine issues of material fact exist concerning whether
Defendants constitute employers under the MPPAA for the purposes
of withdrawal liability.

The parties do not dispute many of the material facts
necessary to resolve such inquiry.  Indeed, neither party
disputes the authenticity of the parties' 1994 agreement setting
forth the requirement that ACHA pay certain fringe benefits.
(See Pl.'s Br. at 5, 17-18; Defs.' Cross-Mot. at 3, 24-25.)  Nor
do Defendants dispute that ACHA remitted payments to the Fund
for the purposes of such benefits.  (Defs.' Opp'n and Reply at
24-25 ("What is a fact, and what is not disputed is that
government funds were sent [by Defendants], e.g. contributions
were made to a plan maintained by another entity.").)  Moreover,
though Defendants assert that ACHA and ACIC cannot constitute
statutory employers under the MPPAA, they concede the entities'
"interlocking nature" and indeed acknowledge that ACIC's
existence "totally depend[ed]" upon ACHA.  (Defs.' Cross-Mot. at
6; Defs.' Opp'n and Reply at 11.)  Rather, Defendants take the
position that "the fundamental structures of" ACHA and ACIC,

34

even if "under a common umbrella," fail to "create a statutory
entity within the parameters of the MPPAA[,]" particularly
because Defendants never intended, by executing the 1994
agreement, to become saddled with the obligations of the MPPAA.
(Defs.' Opp'n and Reply at 10.)

    The Court finds such argument without merit.  No genuine
issue of material fact exists in this instance concerning the
1994 Agreement executed by and between ACHA and Local 1578: it
unequivocally obligated ACHA to pay Local 1578 members "the
current wage rates and all [] fringe benefits" and ACHA received
such carpenters' labor and made such contributions, in
accordance with the agreement, for nearly seventeen (17) years.
(Ptasiewicz Aff., Exs. L, M, N, O, P, Q.) The agreement, coupled
with the surrounding and undisputed course of conduct, therefore
provides ample indicia of ACHA's obligation to contribute to the
Pension Fund.

    In that regard, the Court rejects Defendants' assertion
that Seaway Port Authority of Duluth v. Duluth-Superior ILA
Marine Association Restate Pension Plan, 920 F.2d 503 (8th Cir.
1990), compels any contrary result.  (See Defs.' Cross-Mot. at
24-25.)  In affirming the district court, the Eighth Circuit in
Seaway concluded that a public entity, the Seaway Port Authority
of Duluth (hereinafter, "SPAD"), did not constitute an employer

for the purposes of the MPPAA, because no contractual agreement
obligated SPAD to make pension contributions.  Id. at 509.
Rather, the only applicable agreement referenced the provision
of funds "'to carry on the operations'" and to meet "'payroll
expenses and related fringe benefits.'"  Id. at 509 n.5.  The
Seaway court found the "'fringe benefit'" provision insufficient
to establish SPAD's obligation to contribute to a pension plan
because the provision "clearly" stated that the obligation to
provide such benefits ran to another entity, not SPAD, and
because the provision otherwise failed to mention pension
contributions.  Id.

   Here, however, there is no dispute that the 1994 agreement
and performance thereunder renders ACHA directly liable for
fringe benefit contributions.  See also Trustees of Utah
Carpenters' & Cement Masons' Pension Trust v. Indus. Power
Contractors Plant Maint. Servs., Nos. 09-929, 10-334, 2011 WL
6130932, at *4-*5 (D. Utah Dec. 8, 2011) (noting that making
payments in accordance with an unsigned agreement may constitute
a sufficient course to conduct to bind a party to contribution
liability under ERISA).  Moreover, as more fully explained
below, the undisputed record clearly reflects a litany of
"contribution" payments from ACHA to the Fund in varying amounts
and extending over a number of years, all consistent with ACHA's

obligations to contribute for the carpenters' fringe benefits. (See Ptasiewicz Aff., Exs. M, N, O, P, Q.)

Rather, the Court follows the rationale set forth in NYSA-ILA Pension Trust Fund v. Pouch Terminal, Inc., No. 89-6042, 1990 WL 55713 (S.D.N.Y. Apr. 24, 1990).  In NYSA-ILA Pension Trust, the pension fund plaintiff moved for summary judgment, as here, on the issue of defendant's withdrawal liability.  Id. at *1.  In challenging its liability for a withdrawal penalty, defendant acknowledged the existence of an agreement requiring it to make certain payments to the pension plan, but nonetheless argued that defendant did not qualify as a statutory employer under the MPPAA, nor that it ever "intended to be obligated to [plaintiff] beyond the [remitted] payroll contributions[.]"  Id.

Though the local agreement that governed the parties' relationship set forth terms concerning "wages, hours, vacations and pension contributions[,]" defendants took the position that, in executing such agreement, it intended to incur an obligation "solely for payroll contributions" without being correspondingly "'saddled with withdrawal liability.'"  Id. at *4.  The district court in NYSA-ILA Pension Trust, however, found such position in "conflict[] with the underlying purposes of imposing withdrawal liability: to ensure adequate funding for multiemployer pension plans when the contribution base shrinks due to employers'

withdrawal." Id. (citation omitted).  Rather, the court
concluded that defendant's continued participation in the
pension plan clearly "manifested the requisite intent to
obligate itself for withdrawal liability[,]" particularly
because defendant could have freely avoided withdrawal liability
by declining to execute the local agreement.  Id.

In this action, the Court finds that ACHA and ACIC
constitute statutory employers for the purposes of the MPPAA.
As stated above, it is well-established that an "employer" under
the MPPAA includes any person or entity "obligated to contribute
to a [pension] plan either as a direct employer or in the
interest of an employer of the plan's participants." Korea
Shipping, 880 F.2d at 1537.  Here, the Court need not engage in
any protracted inquiry concerning whether ACHA and ACIC
constitute alter egos, nor whether such entities remain under
common control.  Rather, as the signatory of, and true obligor
under, the 1994 agreement, ACHA clearly falls within the ambit
of a statutory employer for the purposes of withdrawal
liability. (Ptasiewicz Aff., Ex. L.)   Moreover, the 1994
agreement provides for the payment by ACHA of "all" fringe
benefits. (Id.)  Even affording Defendants all reasonable
inferences, such provision connotes a clear obligation to make
pension contributions, particularly when juxtaposed with

38

Defendants' admission that ACHA indeed remitted such sums to the
Fund for more than a decade and for as long as Local 1578
provided carpenters to ACIC for ACHA's work. (See, e.g., Defs.'
SMF at ¶ 8; Defs.' Opp'n and Reply at 24-25.)  Moreover, the
undisputed documentary evidence in this litigation refutes
Defendants' assertion that such transfers occurred without
intention.  (See, e.g., Defs.' Opp'n and Reply at 20-21.)
Indeed, several undisputed exhibits state that such
disbursements constituted "pension fund" contributions.
(Ptasiewicz Aff., Exs. P, Q, U.)  Consequently, even if the 1994
agreement could, to some extent, be deemed ambiguous,
Defendants' actions reflect one clear and consistent
understanding: ACHA and ACIC construed the agreement, in
application, as one binding Defendants to make certain pension
contributions directly to the Fund in connection with employer
Local 1578 carpenters.  The Court finds Defendants' arguments to
the contrary unsupported, and thus insufficient to create a
genuine dispute of material fact.  Indeed, Defendants' position
that its employees would issue payments to the Fund "without any
understanding" of whether and why such monies should have been
paid, and without regard to their authority to disburse same,
quite simply defies reason, and lacks foundation in this record.
(Defs.' Opp'n and Reply at 21 (setting forth counsel's

supposition concerning the motivation of certain personnel).) Rather, the undisputed conclusion remains unchanged: Defendants consistently remitted pension contributions as a result of the obligation delineated in the 1994 agreement and regularly computed by the Fund.  (See generally Pl.'s SMF; Defs.' SMF.)

The undisputed exhibits contained in this record further demonstrate the obligatory, rather than gratuitous, nature of such payments.  Indeed, in one such exhibit, a letter advising of a delinquent pension fund contribution, the former Executive Director of the ACHA specifically directs that ACHA immediately rectify the delinquency.  (Ptasiewicz Aff., Ex. D at 31 on the docket.)  Shortly thereafter, the ACHA's then-Acting Director of Finance enclosed, by letter dated August 31, 2007, a $26,117.50 "payment reflect[ing] all contributions due" to the Fund, and further stated that such payment rendered Defendants' account "up-to-date[.]"  (Ptasiewicz Aff., Ex. U.)  The Court therefore finds that ACHA's continued participation in the Fund provides more than ample indicia of ACHA's acceptance and performance of the obligation to contribute under the MPPAA, thereby rendering ACHA an employer for MPPAA purposes.  See Cent. States, Se. & Sw. Areas Pension Fund v. Progressive Driver Servs., Inc., 940 F. Supp. 1311, 1315 (N.D. Ill. 1996) (concluding that an obligation to contribute, by itself, renders an entity an

40

employer for MPPAA purposes).  Defendants cannot operate as if fully liable and obligated to make federally-protected pension plan contributions and then disclaim such liability when confronted with the prospect of a withdrawal penalty under the MPPAA.  See Delta S.S. Lines, Inc. v. N.Y. Shipping Ass'n, Int'l Longshoremen's Ass'n Pension Trust Fund, 688 F. Supp. 1560, 1563 (S.D.N.Y. 1988) (noting that, "[i]t would frustrate the congressional purpose behind the MPPAA to hold that contributors, which are not common law employers, can never be subject to withdrawal liability"), aff'd, 880 F.2d 1531 (2nd Cir. 1989).

Moreover, under the undisputed facts herein, it is of no consequence that ACIC, rather than ACHA, engaged the Local 1578 members, particularly because such engagement indisputably occurred under ACHA's active direction, oversight, and funding for all such labor expenses.  (See, e.g., Defs.' SMF at ¶¶ 7-9.) ACHA's execution of the 1994 agreement further belies any claim that the ACHA had, in essence, limited control over the Local 1578 members' employment.  (Ptasiewicz Aff., Ex. L.)  Rather, it is clear that the ACHA created ACIC as an instrumentality to enable ACHA to perform tasks otherwise administratively problematic for a public entity.  Indeed, ACHA concedes this reality.  (See Defs.' SMF at ¶ 7; Defs.' Cross-Mot. at 4

41

(asserting that ACHA "experienced problems" directly employing union members and, therefore, "decided to use ACIC to employ the union members and apprentices").)  Given these circumstances, attachment of liability in this instance falls squarely within the core purpose of the MPPAA: preventing employers from strategically shifting assets and control in order to avoid withdrawal liability.  See SUPERVALU, Inc., 500 F.3d at 336 (discussing the purposes of the MPPAA).  Such a maneuver contravenes the fundamental purposes underpinning the MPPAA, and provides no relief to Defendants in this instance.  The Court therefore turns to whether the 1994 Agreement established an obligation to contribute.

### 3. The 1994 Agreement Establishes an Obligation to Contribute

The Court need only briefly address Defendants' assertion that the 1994 Agreement lacks the formalities necessary to create an obligation to contribute under the MPPAA.  (See, e.g., Defs.' Supp. Br. at 2-5.)  Notably, though an obligation to contribute clearly arises as a matter of contract, the Court finds Defendants' assertion that such obligation must solely be evidenced by a collective bargaining agreement unconvincing. (Defs.' Cross-Mot. at 24-25; Defs.' Supp. Br. at 4-5.)

Indeed, the MPPAA, by its very terms, provides that any obligation to contribute may arise "under one or more collective

42

bargaining (or <u>related</u>) agreements[.]" 29 U.S.C. § 1392(a) (emphasis added). A sufficient obligation for purposes of withdrawal liability therefore arises in the context of an array of contractual arrangements, not solely in connection with a collective bargaining agreement. <u>Rheem Mfr. Co. v. Cent. States Se. & Sw. Areas Pension Fund</u>, 63 F.3d 703, 706-07 (8th Cir. 1995) (noting that an obligation to contribute may arise, <u>inter alia</u>, in "collective bargaining agreements, general cargo agreements, or shipping association agreements"). Consequently, the absence of formalities typical in the collective bargaining context does not, without more, end the inquiry before the Court. Rather, "[t]he nature of the obligation to contribute establishing an entity as an 'employer' for MPPAA purposes" is, quite simply, "contractual[.]" <u>Id.</u> at 707 (citation omitted). Here, Defendants do not dispute that the 1994 Agreement, executed by ACHA, constitutes a contract, and otherwise exhibits the traditional contractual formalities. The 1994 agreement, as stated below, further obligated ACHA to contribute to the Fund. The 1994 Agreement therefore suffices, without more, to establish the necessary contractual obligation.

However, even if it did not, an entity may for the purposes of MPPAA liability assume a contractual obligation through a cause of conduct consistent with the existence of an agreement.

43

See Transpersonnel, Inc., 422 F.3d at 460.  In that regard, the
Court finds Russ v. South Water Market, Inc., 769 F.3d 556 (7th
Cir. 2014), reh'g denied (Nov. 5, 2014), instructive.

    In Russ, South Water Market and Local 703 of the Teamsters
Union negotiated the terms of a new collective bargaining
agreement, and "shook hands" on such agreement on September 12,
2007.  Id. at 556.  Despite the hand shake, South Water Market's
bargaining representative, Michael Abramson, failed to provide a
proposed written agreement as a result of "'trouble with [his]
notes.'"  Id.  In April 2008, the Union President, Howard
Murdoch, therefore forwarded his notes from the negotiation,
which set forth the operative terms.  Id.  South Water Market,
however, did not respond, but "began paying the wages, and
making the pension and welfare contributions, specified in
Murdoch's text."  Id. at 557.  In July 2009, a dispute arose
concerning contributions purportedly owed in accordance with the
parties' agreement, with South Water Markets arguing, in
essence, "that it never agreed to terms that Murdock drafted in
April 2008."  Id.

    The District Court for the Northern District of Illinois
granted South Water Market's motion for summary judgment,
principally on the basis that South Water Market never executed
Murdoch's draft, nor conveyed assent to such draft.  Id.  The

Court of Appeals for the Seventh Circuit reversed, finding, in relevant part, that South Water Market's "performance" provided sufficient indicia of its "assent to be bound."  Id. (citations omitted).  In that regard, the Russ court noted that, because South Water Market put into effect the terms of the April 2008 document, it could not claim that such document acted as a proposal, or an otherwise unenforceable agreement.  Id. at 558.

Rather, the Court found that, in the event South Water Market intended "to accept some clauses and reject others, it should have said so in April 2008."  Id.  Yet, as here, "its first protest came in response to [the pension funds'] August 2009 bills."  Id.  Indeed, the court found South Water Market's reservation, in whatever form, was conveyed "much too late" to preclude the agreement's enforcement.  Id.  Rather, because the prevailing law entitles pension and welfare funds to enforce the writings they receive, and "analogizes them to holders in due course, not to simply third-party beneficiaries whose rights can be cut off at the contracting parties' whim," the Russ court reversed for a calculation of the amount owed pursuant to the April 2008 agreement.  Id.

Here, as in Russ,[11] the Court cannot ignore ACHA's lengthy and undisputed payment history, as stated above.  In that regard, the opportunity to object to the attachment of any contribution obligations arose in the period immediately subsequent to ACHA's execution of the 1994 Agreement, not simply in response to the Fund's July 27, 2011 demand.  Never in the 17 years that the 1994 Agreement existed did ACHA or ACIC dispute that it was bound to make the pension fund contributions.  For all of these reasons, the Court finds an obligation to contribute.  The Court holds that Defendants ACHA and ACIC are statutory employers which are liable to pay the withdrawal penalty under the MPPAA.

V.   **CONCLUSION**

The Court accordingly concludes that Defendants qualify as statutory employers subject to an obligation to contribute under the MPPAA.  The Court therefore grants the Fund's motion for

---

[11] The Court rejects Defendants' assertion that Russ is inapposite to this litigation on the basis that the disputed issues in Russ arose in connection with negotiations over a collective bargaining agreement.  (Defs.' Supp. Br. at 5.) Rather, the Court finds Russ applicable to this litigation, in light of the fact that Russ clearly envisions an obligation to contribute arising in an array of contexts, including, as here, in connection with an undisputed course of conduct consistent with a contractual arrangement.  Indeed, the present case presents an even clearer case for employer liability than Russ, in which the dispute about pension payments arose in the very first year of the agreement.

summary judgment as to Defendants' qualification as a statutory employer, and denies Defendants' cross-motion in its entirety.

Specifically, the Court finds that ACHA and ACIC are statutory employers liable to pay a withdrawal penalty to the Pension Fund under the MPPAA arising from their agreement with Local 1578 to pay fringe benefits dated August 26, 1994, which continued until Defendants' withdrawal occurred in 2011. Further, the Court finds that Defendants' counterclaims for a declaratory judgment that Defendants are not liable for MPPAA withdrawal liability will be denied and judgment on the counterclaims will be entered in favor of the Plaintiff.

The Court makes no determination of the amount of withdrawal liability Defendants owe to the Fund. In light of the parties' assertion concerning the pendency of the arbitration proceeding, in addition to the MPPAA's clear mandate that, "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration[,]" 29 U.S.C. § 1401(a), the Court will not enter final judgment at this time. Rather, the Court shall direct the parties to arbitrate pursuant to § 1401(a) and administratively terminate this action, without prejudice, to enable the parties to proceed, as desired and/or statutorily

47

required, to arbitration concerning any matters remaining in dispute that have not been adjudicated herein, including the amount of the withdrawal penalty.

The accompanying Order will be entered.


**December 17, 2014**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge

48